**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert H. GULLETT (81–1536), Marvin**
**Fox (81–1537), Defendants-Appellants.**

**Nos. 81–1536, 81–1537.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 9, 1982.

Decided July 28, 1983.

Rehearing Denied Aug. 31, 1983.

---

Ivan E. Barris (argued), Barris, Colob & DuMouchel, Detroit, Mich., for Gullett.

Leonard R. Gilman, U.S. Atty., Detroit, Mich., Sara Criscitelli (argued), Appellate Section, Crim. Div., Washington, D.C., for plaintiff-appellee.

Neil H. Fink (argued), Detroit, Mich., for Fox.

Before MERRITT and CONTIE, Circuit Judges, and MOYNAHAN, District Judge.*

CONTIE, Circuit Judge.

Robert Gullett and Marvin Fox appeal their convictions on multiple counts of interstate transportation of stolen securities, 18 U.S.C. § 2314, four Travel Act offenses, 18 U.S.C. § 1952, conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO), 18 U.S.C. § 1962(d), and conspiracy to defraud the United States, 18 U.S.C. § 371. Defendant Gullett was also convicted on one count of obstruction of justice, 18 U.S.C. § 1503, and four counts of tax evasion, 26 U.S.C. § 7201. For the reasons stated below, we affirm their convictions.

I.

The defendants were partners in Gullett, Fox and Boyer, an accounting firm located in Southfield, Michigan. Prior to July, 1977, the firm had occasionally allowed clients to write checks to the firm for non-existent accounting services, and then cashed those checks for the clients. In July, 1977, Wayne Boyer, the most junior of the three partners, met Robert Davis, a Canadian insurance agent. Davis told Boyer that he had a line of credit at the Metropolitan Trust Company in Windsor, Ontario, and that he could cash checks there and bring the money back to this country in United States currency. After this meeting, Boyer suggested to the defendants that the firm use Davis to cash their clients' checks for them in Canada for a fee of five percent of the face amount. The defendants agreed to the idea, and Boyer became an intermediary in the check-cashing plan. This involved turning the checks over to Davis, and, upon Davis' return, sending the proceeds to their clients.

The Industrocraft Checks

In September, 1977, Joseph Leich, the chief operating officer of Industrocraft, Inc., asked defendant Gullett, his corporate and personal accountant, if there was any

---

* The Honorable Bernard T. Moynahan, Jr., Chief Judge, United States District Court for the Eastern District of Kentucky, sitting by designation.

way Industrocraft could generate cash "to take care of some customers." Gullett suggested that Leich make out a check from Industrocraft to the accounting firm for "commissions." According to Gullett's plan, the defendants would pay the income tax on the sum, Industrocraft would get a business tax deduction, and Leich would receive 50% of the check's face amount. Leich agreed, and made out a check to Gullett, Fox and Boyer for $8,578.86. This sum was falsely entered in Industrocraft's books as a "legal and accounting" expense. Gullett gave Boyer the check to give to Davis. Davis cashed the check in Windsor, Ontario, and gave Boyer the proceeds minus his five percent commission. The defendants took their share of the proceeds, and Gullett gave the balance to Leich. This procedure was repeated on at least nine other occasions over a two and one-half year period, with Leich naming the defendants' accounting firm, Davis, and even fictitious persons as payees. When Robert Leich, Industrocraft's majority shareholder and Joseph Leich's brother, asked his brother and Gullett who Davis was, they told him that Davis was a manufacturer's representative from Ohio. The record indicates that all the checks were falsely entered in Industrocraft's records as commission payments to the above-mentioned payees.

The Delta Tube Check

In 1978, Genova, Inc., a firm that manufactures plumbing supplies, closed one of its plants. As a result of the closing, it had an electrical transformer to dispose of. The record indicates that several of Genova's officers discussed the possibility of selling the transformer and keeping the proceeds. One of the officers asked Boyer if his accounting firm could supply a phony invoice. Boyer agreed to do so, and sent an invoice from a fictitious entity called Crown Electric Company.

In May, 1978, Delta Tube & Fabricating Corporation agreed to buy the transformer. When Delta arranged to pick up the transformer, it was told that Crown Electric had already bought the transformer, and thus to make its check payable to Crown Electric. The Genova officers sent the check to the defendants' accounting firm, and they gave it to Davis to cash in Canada. After Davis and the defendants took their commission, the remainder of the proceeds were divided among the Genova officers.

The Guardian Life Checks

The Guardian Life Insurance Company provided insurance packages for various business enterprises, which included the payment of rebates or dividends. In July and August, 1979, Bruce Eavenson, a district group manager employed by Guardian, brought several dividend checks to Vincent Mancuso, an independent insurance agent. Mancuso called defendant Fox, his accountant, and asked if Fox knew of a way to cash checks that belonged to other people. Fox told him that Boyer could cash the checks for a fee of 25%. Mancuso returned the checks to Eavenson and referred him to the defendants' accounting firm.

Eavenson called Boyer and made the arrangements. Boyer initially received three checks, totalling about $23,000, which were taken to Canada by Davis and cashed in August, 1979. Several weeks later, Boyer gave Eavenson the proceeds, minus the agreed commission. At Fox's suggestion, Fox and Boyer did not initially inform Gullett of the transaction. Eavenson eventually gave Boyer four more checks which were also cashed in Canada. Gullett received a portion of the commission from these checks, and later received his share from the first group. The endorsements on all the checks were forged, and none of the proper payees received any of their earned dividends.

The Commercial Contracting Corporation and Brencal Contractors, Inc. Checks

Commercial Contracting Corporation installed major industrial machinery on an international scale. In July, 1977, Commercial bid on a construction project planned for a Chrysler assembly plant in Illinois. A competitor of Commercial's, Fischbach and Nathin, Inc., also bid on the project. Shortly thereafter, Patrick Conlon, an executive at Fischbach and Nathin, called an officer of Commercial and said that Fischbach and Nathin had outbid Commercial for the job, but would use its influence to see that

Commercial was awarded the contract in exchange for $100,000. After consulting with the president of Commercial Contracting, the officer agreed to pay.

Conlon then sought the assistance of Raymond Vecellio, the chief operating officer of Vecellio Electric Company. Conlon asked Vecellio if the latter could cash checks through Vecellio's company. Since the defendants' firm handled Vecellio's accounting work, Vecellio consulted them about the proposal. Boyer discussed the proposal with Fox and Gullett, and later agreed that the firm would help cash checks for Vecellio. Vecellio in turn agreed to help Conlon in order to receive further contracts from Fischbach and Nathin.

According to the plan, Conlon would notify Vecellio whenever a payoff from Commercial was arranged. Vecellio would prepare a false invoice for Commercial, and Commercial would then write a check. The record indicates that the president of Commercial was deceived into signing the checks by his son and two corporate officers, who had initialed several of the false invoices for payment. Vecellio would deliver the check to Boyer, who would give it to Davis to cash in Canada. The proceeds of the check, minus the shares taken by the participants, would then be delivered to Conlon. Vecellio prepared five such invoices, and Commercial disbursed almost $111,000 for Vecellio's "services."

In June and July, 1979, Conlon solicited Vecellio's assistance in collecting $50,000 from Brencal Contractors, Inc. Vecellio again agreed and prepared two phony invoices for payment by Brencal Contractors. Vecellio gave the Brencal checks, totalling over $41,000, to Boyer, who gave them to Davis to cash in Canada. Boyer then gave the proceeds, minus the various fees, to Conlon.

Subsequently, Vecellio himself approached defendant Gullett and requested that Gullett assist him in raising some money. Gullett suggested that Vecellio write a check to Gullett's accounting firm for twice the amount he needed. The firm would cash it and retain 50% to pay the taxes. Vecellio wrote two such checks, totalling $23,000, and received $11,500 from the defendants' firm.

The American International Checks

In January, 1979, American International Contracting, Inc., a corporation engaged in leasing and installing rigging equipment, leased equipment under a contract to Fischbach and Nathin. In November, 1979, Conlon approached Frank Vallecorsa, the president of American International, and requested that American International help him to procure funds to bribe certain individuals at Ford Motor Company. Vallecorsa agreed to submit a backdated false invoice to Fischbach and Nathin for the leasing of a thirty-ton forklift. As a result of Vallecorsa's invoice, Fischbach and Nathin paid American $40,000 for the services of a forklift which, the record indicates, never even existed. Vallecorsa then wrote a check payable to Conlon for the $40,000. Conlon, however, refused to accept the payment in his own name, and instead prepared another phony invoice from Johnson & Company, a fictitious entity. Vallecorsa completed the blank invoice and billed his company for $39,880. He then wrote a check from American International to Johnson & Company for $39,880. Conlon delivered the check to Davis, who cashed it in Canada.

In December, 1979, Vallecorsa told Conlon that American International was bidding for a contract to install equipment for a construction job at a Chrysler plant in Indiana. Conlon offered to see that American International received the contract in exchange for $15,000, plus an additional $2,500 to bribe a competitor. Vallecorsa agreed, and in January, 1980, wrote another check to Johnson & Company for $17,500. Boyer delivered the check to Davis, but both were arrested before the proceeds could be distributed.

Boyer was arrested in January 1980. Several months later, Gullett notified Joseph Leich that the authorities were investigating them. By that time, grand jury subpoenas had been served on both men. They later met in the presence of Leich's attorney to discuss Leich's upcoming grand

jury appearance. Gullett suggested that Leich testify that he received 90% or 95% of the proceeds of each Industrocraft check, instead of the 50% that he actually received. Gullett repeated this request at a subsequent meeting. By this time, however, Leich had met with government agents and had agreed to tape this second meeting. The tape recording was admitted at trial against both Gullett and Fox. The defendants now bring this appeal.

## II.

The defendants allege that the district court abridged their sixth amendment confrontation rights by impermissibly limiting the cross-examination of Joseph Leich, the chief operating officer of Industrocraft. On direct examination, Leich testified that he embarked upon the laundered money scheme to generate "cash to take care of some customers." He also testified that he received one-half of the face amount of each check. On cross-examination, Leich was asked what he did with his share of the money. Leich replied "I passed it on to various people who do business with us, to bribe them." When the defense asked Leich for the identities of the individuals who received bribes, the government objected on relevancy grounds, and Leich subsequently asserted his fifth amendment privilege against self-incrimination. The defendants contend that Leich waived his fifth amendment privilege to withhold the names of those bribed once he admitted that he had in fact used his share of the money to bribe business associates. We disagree.

Cross-examination is the principal means by which the credibility of a witness and the truth of his testimony are tested. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). Nevertheless, the defendant's right to discredit a prosecution witness on cross-examination cannot overcome the witness' privilege against self-incrimination, if properly asserted. *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931); *United States v. LaRiche,* 549 F.2d 1088, 1096 (6th Cir.), *cert. denied,* 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 383 (1977).

The privilege is properly invoked if the trial court determines that, in light of all the circumstances, the answer to a particular question would subject the witness to a real danger of further incrimination. *Rogers v. United States,* 340 U.S. 367, 374, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951).

Applying these principles, we hold that Leich properly invoked his fifth amendment privilege. Although Leich had been granted informal immunity by the federal prosecutors, this immunity did not extend to testimony regarding his acts of bribery. Thus, his testimony could have been used by the state of Michigan in a prosecution for commercial bribery under M.C.L.A. 750.125. *See Kastigar v. United States,* 406 U.S. 441, 456–59, 92 S.Ct. 1653, 1662–63, 32 L.Ed.2d 212 (1972); *Malloy v. Hogan,* 378 U.S. 1, 10–11, 84 S.Ct. 1489, 1494–95, 12 L.Ed.2d 653 (1964). Since disclosure of those who received bribes would surely have enhanced any state prosecution of Leich by providing the state with the names of potential prosecution witnesses, we hold that the district court properly upheld Leich's claim of privilege. *United States v. LaRiche, supra; United States v. Seifert,* 648 F.2d 557, 561 (9th Cir.1980).

The defendants alternatively contend that if Leich properly invoked his fifth amendment privilege, the district court should have either struck Leich's direct testimony or instructed the government to give Leich formal immunity.

When a witness has properly invoked the privilege against self-incrimination, the question of whether to strike the witness' direct testimony turns on whether the defendants' inability to complete their inquiry created a "substantial danger of prejudice by depriving [them] of the ability to test the truth of the witness' direct testimony." *Fountain v. United States,* 384 F.2d 624, 628 (5th Cir.1967), *cert. denied,* 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968). If assertion of the privilege precludes inquiry into matters which involve elements or specific events of the crimes charged, there may be substantial danger of prejudice in not allowing the defendants to test the truth of

the witness' direct testimony. In that case, all or part of the witness' direct testimony should be stricken. *United States v. Stephens,* 492 F.2d 1367, 1374–75 (6th Cir.), *cert. denied,* 419 U.S. 852, 95 S.Ct. 93, 42 L.Ed.2d 83 (1974). If, however, the invocation of the privilege merely precludes inquiry into collateral matters which bear only on the general credibility of the witness, there is little danger of prejudice to the defendant, and, therefore, the witness' direct testimony need not be stricken. *Id.*

In this case, Leich never testified on direct examination that he actually bribed anyone, and thus Leich's refusal to answer the defense's question regarding the names of those bribed did not hinder the defense's ability to test the reliability of Leich's direct testimony. Moreover, the government did not have to prove that an act of commercial bribery had occurred in order to obtain a Travel Act conviction,[1] or a conviction under 18 U.S.C. § 2314.[2] Therefore, Leich's refusal did not preclude the defense's inquiry into matters involving elements or specific events of the crimes for which the defendants were being tried.

Instead, the defense attorney stated at trial that the purpose of the question was to undermine Leich's credibility. While this court recognizes the importance of allowing the defense to engage in a full and complete cross-examination of key government witnesses such as Leich, *Davis v. Alaska,* 415 U.S. at 317–18, 94 S.Ct. at 1110–11, we hold that the defendant's question would only have elicited cumulative testimony concerning Leich's credibility. Leich's testimony on direct and cross-examination provided the defense with ample information to attack Leich's character and his motives for testifying for the prosecution. Specifically, Leich (1) admitted complicity in the charged offenses and the tax fraud scheme; (2) testified that he felt Gullett was responsible for his involvement in the case, and that he knew he might be facing criminal charges when he initially agreed to assist the government by taping his conversation with Gullett; and (3) admitted that he had entered into a plea agreement with a maximum sentence of two years, and that he was seeking leniency by giving testimony in this case. Under the circumstances, we find no abuse of discretion in the district court's refusal to strike all or part of Leich's direct testimony.

■ The defendants also contend that the district court should have instructed the government to immunize Leich.

This circuit has previously held that courts have no power to compel the United States Attorney to immunize defense witnesses. *United States v. Lenz,* 616 F.2d 960, 962 (6th Cir.), *cert. denied,* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980). Other circuits, however, have indicated that, under appropriate circumstances, they might find that a prosecutor's immunity decisions violate due process. *See, e.g., United States v. Morrison,* 535 F.2d 223, 229

---

1. The Travel Act, 18 U.S.C. § 1952, states:
   (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce ... with intent to—

   .       .       .       .       .

   (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
   and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for more than five years or both.
   (b) As used in this section "unlawful activity" means ...
   (2) extortion, bribery, or arson in violation of the laws of the state in which committed or of the United States.

The statute contains no requirement that the "unlawful activity", which in this case is the state crime of commercial bribery, actually be accomplished. *United States v. Goldfarb,* 643 F.2d 422, 426 (6th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 118, 70 L.Ed.2d 101 (1981).

2. The National Stolen Property Act, 18 U.S.C. § 2314, states:
   "Whoever transports in interstate or foreign commerce any ... securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... shall be fined not more than $10,000 or imprisoned not more than ten years, or both ...."

(3rd Cir.1976); *Earl v. United States,* 361 F.2d 531, 534 n. 1 (D.C.Cir.1966), *cert. denied,* 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967). We believe that the issue posed by the cited cases is not whether the legislative mandate leaving the immunization decision in the hands of the prosecution is constitutionally permissible, but whether the prosecution has exercised its discretion in a manner that violates due process. In this context, we hold that the defendants were not denied due process because of the government's refusal to immunize Leich. As noted earlier, Leich's response would have been cumulative testimony regarding his credibility, and thus collateral to the central issues of this case. *See United States v. Allesio,* 528 F.2d 1079, 1082 (9th Cir.), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976).

### III.

The defendants' second assignment of error is that there was insufficient evidence to support their convictions on 14 counts of violating the National Stolen Property Act, 18 U.S.C. § 2314.[3] The defendants were convicted under that portion of Section 2314 which prohibits the interstate transportation of any securities or money of the value of $5,000 or more which the defendant knows "to have been stolen, converted or taken by fraud." The words "stolen, converted or taken by fraud" have been construed to encompass virtually all ways by which an owner is wrongfully deprived of the use of his property. *United States v. Evans,* 579 F.2d 360, 361 (5th Cir.1978); *United States v. Frakes,* 563 F.2d 803, 805–06 (6th Cir.1977), *vacated and remanded on other grounds* 435 U.S. 911, 98 S.Ct. 1464, 55 L.Ed.2d 503 (1978); *Lyda v. United States,* 279 F.2d 461, 464 (5th Cir.1960).

■ Viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we hold that the defendants' convictions are supported by sufficient evidence. The defendants contend that the evidence shows only that officers of several corporations used their broad agency powers to write checks for the purpose of generating cash to benefit the corporations. This explanation, however, ignores the parade of phony invoices and fictitious payees which were created in order to deceive uninvolved corporate officers and shareholders.

In the case of the Industrocraft checks, the evidence shows that Joseph Leich and the defendants defrauded Robert Leich, Industrocraft's majority shareholder, by recording the checks as commission payments to defendants' accounting firm, to Davis, and to other fictitious payees. When Robert Leich became concerned and asked his brother and Gullett who Davis was, they told him Davis was a manufacturer's representative from Ohio. In reality, Davis was a member of the conspiracy. The record also indicates that Gullett concealed from Robert Leich several of the checks made out to Davis after Leich had asked to see them. The American International checks were similarly prepared by corporate officers who knew American International was paying for nonexistent work evidenced by phony invoices. The record indicates that American International's principal stockholder would not have consented to these payments had he known the truth.

In the case of the Commercial Contracting checks, the president of the corporation was deceived into signing the checks by his son and two other corporate officers, who had initialed several of the fraudulent invoices sent by Vecellio. Initialing an invoice was the standard method of approving it for payment. Thus, the president was led to believe that the invoices represented legitimate obligations to Vecellio's company. Had he known the invoices were false, he would not have signed the checks. In the case of Delta Tube check, the defendants not only transported the check in foreign commerce "knowing the same to have been ... taken by fraud," but actual-

---

**3.** Unlike Gullett, defendant Fox was acquitted on one of these 14 counts (count 2) and therefore appeals only his convictions under the remaining 13 counts. Neither defendant con- tests his convictions under Section 2314 on counts 11 and 12, which involve the Guardian Life Insurance Company checks.

ly supplied the Genova corporate officers with the false invoice from Crown Electric Company. This invoice allowed the Genova officers to deceive the representative from Delta Tube into thinking that Genova's generator had already been sold to Crown Electric. When Delta Tube delivered its check to Crown Electric, the Genova officers pocketed the proceeds after giving the defendants their cut. The record therefore indicates that the defendants directly participated in the scheme to defraud the Genova corporation of the proceeds of the sale of one of its assets.

With respect to each check that was cashed in Canada the defendants participated in a scheme that required the preparation of false invoices and documents as a cover for the cashing of the check. These false statements were then used by corporate officers as a basis for corporate payments. Although corporate officers with broad agency powers authorized and participated in the scheme, the officers necessarily made false entries on the books of their corporations in order to secure the corporate payments. These false entries deliberately misrepresented the nature of the transactions to the corporation as an entity and hence to its owners, the shareholders, and its directors. In reliance on these false statements, the corporation made the payments. The defendants knew the invoices and documents were false and that the corporations would rely on them to make payments. Thus the basic elements of fraud—misrepresentation and detrimental reliance—are present.

It is true, as defendants argue, that corporate officers did not take corporate funds for their own benefit at the expense of the corporation from the proceeds of the checks in each instance. For example, the proceeds from the Industrocraft and American International checks were used to pay commercial bribes and were not used to enrich directly the corporate officers who participated in the scheme.[4] Nevertheless, money was taken from the corporation based on false invoices and documents and false corporate entries and hence the property of others was "taken by fraud" as a result of the scheme.

## IV.

The defendants also contend that three of the four Travel Act counts are multiplicious. The three counts (counts eight, eighteen, & nineteen) use identical statutory language to accuse the defendants of causing Robert Davis to travel in foreign commerce from Southfield, Michigan to Windsor, Canada with the intent to promote the payment of unlawful bribes. Each count, however, alleges that the defendants caused Davis to travel on different, but overlapping, dates.[5] The defendants argue that the three counts lack specificity regarding the circumstances surrounding each violation, the dates of the alleged travel, and the precise nature of the underlying state offense.

Multiplicity is the charging of a single offense in several counts of the indictment. *United States v. Robinson,* 651 F.2d 1188, 1194 (6th Cir.), *cert. denied,* 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 182 (1981). A multiplicious indictment raises the specter of multiple punishment for a

---

**4.** The defendants also argue that the corporations were not deprived of the use or benefit of their property because almost all of the checks were used to bribe individuals who could insure that the corporations would receive lucrative contracts. Thus, the defendants reason, the checks were used to advance the interests of the corporations involved.

This argument is completely without merit. The evidence clearly shows that each corporation was fraudulently induced into paying for products or services which were never received. *United States v. Evans,* 579 F.2d 360, 361 (5th Cir.1978). Moreover, it is undisputed that at least 10% of every check was retained by the defendants and their cohorts as a commission, and not for corporate purposes. Finally, we find the argument that the corporations were benefited by conduct which in fact violated federal and state law to be meritless.

**5.** Count 8 charges that the defendants caused Davis to travel between September, 1977 and April, 1979. Count 18 charges that the defendants caused Davis to travel between January, 1978 and September, 1978. Count 19 charges that the defendants caused Davis to travel between June, 1978 and July, 1978.

single offense, and can prejudice the jury by suggesting that more than one crime was committed. *United States v. Sue,* 586 F.2d 70, 71–72 (8th Cir.1978). In the present case, the wording of the Travel Act counts unambiguously sets forth all the elements of a Section 1952 offense, and is supplemented with enough detail to apprise the defendants of each separate violation. Each count (1) identified the defendants, (2) identified the person whom the defendants cause to travel in foreign commerce, (3) listed the approximate dates in which the travel occurred, (4) the cities involved, and (5) identified both the underlying state offense which the defendants furthered as being commercial bribery, and the precise Michigan statute which prohibited such activity.

Furthermore, the indictment is structured so that each Travel Act count follows its related Section 2314 counts. Thus, count twenty-two's allegation of travel on or about November 27, 1979 corresponds to the Section 2314 violation involving an American International check in count twenty, which occurred on November 27, 1979. Count eighteen's allegation of travel between January, 1978 and September, 1978 corresponds to the five Section 2314 violations involving the Commercial Contracting checks in counts thirteen through seventeen, which occurred between January 11, 1978 and September 12, 1978. Count eight's allegation of travel between September, 1977 and April, 1979 is related to the Section 2314 violations involving the Industro-craft checks in counts two through seven, which occurred between September 13, 1977 and November 22, 1978. The variance in the two time periods was remedied by the government's bill of particulars, which revised the travel period in count eight to September, 1977 through November, 1978. Count nineteen's charge of travel between June, 1978 and July, 1978 corresponded to overt acts thirty-seven through forty-three of count one, which involved the Brencal Contractor's checks, and occurred between June 29, 1978 and July 13, 1978. While a list of these overt acts did not immediately precede count nineteen, the bill of particulars cured any omission of detail by repeat-

ing the overt acts and by indicating that these overt acts occurred between June 29, 1978 and July 13, 1978.

In clarifying counts eight and nineteen, the bill of particulars was properly used to inform the defendant of the precise nature of the charges against him, to avoid or minimize the danger of surprise at trial, and to cure omissions of detail in order to facilitate a plea of double jeopardy in a subsequent prosecution for the same offense. *United States v. Birmley,* 529 F.2d 103, 108 (6th Cir.1976). Accordingly, we hold that each Travel Act count sufficiently identifies a separate and distinct offense.

## V.

[11] The defendants object to the jury instruction that the element of knowledge in 18 U.S.C. § 2314 may be inferred from proof that the defendants "acted with a reckless disregard for the truth or with a conscious purpose to avoid learning the truth about the unlawful transaction involving the checks." The defendants maintain that this instruction permitted their conviction on proof amounting to negligence. We disagree. The instruction does not authorize a conviction based on negligent behavior, but rather prevents a criminal defendant from escaping conviction merely by deliberately closing his eyes to the obvious risk that he is engaging in unlawful conduct. This interpretation, as well as the instruction itself, has already been upheld by this court. *See United States v. Seelig,* 622 F.2d 207, 213 (6th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980).

## VI.

Defendant Fox contends that the district court erred in allowing the recorded conversation between Gullett and Joseph Leich to be admitted against him. At trial, the defense counsel argued that Gullett's statements were hearsay and could not be used against Fox because the meeting occurred after the conspiracy had terminated. The district court disagreed, and ruled that Gullett's statements were admis-

sible against Fox because they were made "in furtherance of the conspiracy." *See* *Fed.R.Ev.* 801(d)(2)(E).

It is settled that Rule 801(d)(2)(E) of the Federal Rules of Evidence allows hearsay statements of one conspirator to be admitted against his fellow conspirators only if the statement was made in the course of, and in furtherance of, the conspiracy, and not during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise. *Krulewitch v. United States,* 336 U.S. 440, 443–44, 69 S.Ct. 716, 718, 93 L.Ed. 790 (1949). In this case, the record indicates that the conspiracy had in fact terminated prior to the meeting between Leich and Gullett. Davis and Boyer had already been arrested, and the defendants were under investigation by the grand jury. Furthermore, the record indicates that the principal purpose of the meeting was to discuss ways to conceal information from the grand jury. We therefore hold that Gullett's statements could not be admitted against Fox under Rule 801(d)(2)(E).

Our finding that error was committed does not, however, end our inquiry. Although the introduction of Gullett's hearsay statements against Fox in this joint trial arguably violated Fox's sixth amendment confrontation rights, *Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476 (1968), we hold that any error was harmless beyond a reasonable doubt. *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

The references to Fox on the tape must be taken in context in order to appreciate their prejudicial effect. In the actual conversation between Gullett and Leich, which lasted almost one hour and covered nineteen pages of transcript, there are only seven references to Fox, four of which could be construed as prejudicial. The first is when Gullett stated that he told Fox that Davis was taking 10% of each check as a service charge. The second is another statement by Gullett in which he told Fox that he refused to continue the check-cashing operation. The third is when Gullett said that he had expressed his concern to Fox that Boyer had his own attorney, and the fourth is when Leich asks if both defendants "are going to cover" for him. Since Vincent Mancuso and Wayne Boyer had already testified of Fox's active involvement in the conspiracy, we find beyond a reasonable doubt that these passing references to Fox, made during a conversation which was principally devoted to a discussion of Leich's impending grand jury appearance, were harmless. In this respect, the case at bar is clearly distinguishable from cases in which the inadmissible hearsay statements represented the only proof of an essential element of the alleged offense. *See, e.g., United States v. Felix-Jerez,* 667 F.2d 1297, 1304 (9th Cir.1982); *United States v. Lang,* 589 F.2d 92, 100 (2nd Cir.1978).

### VII.

We also disagree with Fox's argument that he was denied effective assistance of counsel due to the joint representation of both defendants by the same attorney. Pursuant to Federal Rule of Criminal Procedure 44(c),[6] the district judge held a pre-trial hearing with both defendants and their defense counsel, Mr. Barrett, to raise the conflict of interest issue. The district judge and Mr. Barrett indicated that a conflict of interest could arise, and expressly warned the defendants of that possibility. The defendants responded that they under-

---

**6.** Federal Rule of Criminal Procedure 44(c) states:

Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

stood the possibility of conflict, and both expressly waived their right to separate counsel.

Fox contends, however, that an actual conflict arose during the trial because of Barrett's failure to distinguish the "minimal" and "acquiescent" conduct of Fox from the dominant role played by Gullett. This argument is without merit. The record indicates that Barrett diligently represented Fox's interests at trial. He successfully persuaded the court to dismiss the obstruction of justice charge against Fox, and, contrary to Fox's assertions, reminded the jury on several occasions that the testimony of key government witnesses tended only to implicate Gullett, and not Fox. Under the circumstances, we find no actual conflict of interest in Barrett's representation of Fox and Gullett. *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).

Accordingly, the judgment of the district court is AFFIRMED.