25 F.3d 1051
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jose ESTEVEZ, Defendant-Appellant
 No. 93-3763.
 United States Court of Appeals, Sixth Circuit.
 May 18, 1994.
 
 Before: MERRITT, Chief Judge; GUY and BOGGS, Circuit Judges.
 MERRITT, Chief Judge.
 
 
 1
 Jose Estevez was convicted of conspiracy to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. Sec. 846. On appeal, he raises a significant question about a rebuttal witness's invocation of his Fifth Amendment privilege against self-incrimination, as well as five other trial and sentencing issues. We affirm his conviction and sentence for the reasons set forth below.
 
 I. Background
 
 2
 Columbus, Ohio, police received information that co-defendant and government witness Thomas Tarini would be picking up five kilograms of cocaine on November 11, 1991, and would be making a stop at a certain address. Police placed surveillance on Tarini and on that address, and on November 11 they saw Tarini arrive at the address, remain about a half hour, and leave. Police followed Tarini as he drove away in a very erratic manner and called in marked police cars to stop him for reckless driving. When police stopped Tarini and searched his vehicle, they found approximately two kilograms of cocaine, $12,425 in cash, and an "owe sheet."
 
 
 3
 Tarini agreed to cooperate with the police. In addition to providing information about a drug conspiracy in which he participated, Tarini agreed to place a recorded phone call to defendant Jose Estevez, whom he identified as his supplier, at the motel where Estevez was staying. Tarini asked Estevez to come to Tarini's home to receive money that Tarini owed him. Estevez did come to Tarini's home a little after midnight on November 12, where he accepted a bag of cash from Tarini. As Estevez left Tarini's home, police arrested Estevez and seized from him a brown paper bag containing $12,425 in U.S. currency, a pager, a small vial containing cocaine, various motel receipts, a Tennessee Highway Patrol speeding ticket, a computer, and computer accessories.
 
 
 4
 The Grand Jury for the Southern District of Ohio, Eastern Division, indicted Estevez on three counts: (1) conspiracy to possess with intent to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. Sec. 846; (2) possession with intent to distribute five kilograms of cocaine, in violation of 21 U.S.C. Sec. 841(a)(1); and (3) use of a telephone to facilitate the commission of a drug felony, in violation of 21 U.S.C. Sec. 843. Estevez pled not guilty to all three counts.
 
 
 5
 On July 2, 1992, a jury found Estevez guilty of the conspiracy charge but acquitted him of the possession and telephone charges. The court sentenced him to a prison term of 10 years and 1 month, plus five years of supervised release.
 
 II. Sufficiency of the Evidence
 
 6
 On appeal, Estevez argues that there was insufficient reliable evidence to show that he knowingly participated in the sale and distribution of cocaine. The evidence in this case consisted mainly of the following:
 
 
 7
 . Estevez agreed to a late-night pick-up of a bag of cash from Thomas Tarini, who had identified Estevez as his distributor (though Tarini did not testify at trial). During the call to set up this meeting, Estevez asked Tarini if he had "the complete job," and told him he would pick up the money at the "same place as always." Tarini convinced him, however, to come to Tarini's house on this particular night.
 
 
 8
 . Estevez said the money was a down payment on $30,000 worth of computer equipment and services he was supplying to a construction business and restaurants owned by Thomas Tarini and his father Richard. He said he accepted the money in cash because he was leaving town the next day and could not wait for Thomas Tarini to provide it in another form.
 
 
 9
 . Estevez's father, who owns a Florida electrical engineering firm, testified that he employed his son full-time. He also testified that his son went to Columbus in November, 1991, to receive payment for computer equipment supplied to the Tarinis.
 
 
 10
 . The cocaine found on Estevez at Thomas Tarini's residence matched the purity of the cocaine seized from Tarini earlier in the day.
 
 
 11
 . Estevez's fingerprint was the only print found on the cocaine seized from Thomas Tarini earlier in the day. Estevez said that it must have gotten there when, during an earlier meeting, Estevez shoved away a bag of cocaine Tarini tried to show him "to impress him." Estevez also points out that the jury acquitted him of the charge of possession of five kilograms of cocaine--an amount that included the cocaine on which his print was found.
 
 
 12
 . Estevez was arrested with a pager which Thomas Tarini regularly called. Estevez calls this "innocuous," indicating that he carried a pager so that his computer clients and contacts could reach him on the road. Estevez admitted that he and Tarini had agreed on a personal code that Tarini could use to page him.
 
 
 13
 . As for his numerous trips to Columbus from his home in Florida, Estevez explained that he was engaged in designing and proposing to the Burger King Corporation an automated drive-through window to be installed in over twenty Burger King restaurants in the Columbus area. However, Estevez was unable during questioning or on cross-examination to identify by name or on a map any such restaurants. On the other hand, a Burger King executive testified that Estevez was in fact conducting a survey of Columbus-area Burger King restaurants to see about the installation of an automated drive-through ordering system.
 
 
 14
 . Estevez claimed that the cash he received from Thomas Tarini was part payment for computer equipment and services ordered by his father, Richard Tarini, for his construction business. Richard Tarini testified, however, that although he had twice discussed computers with Estevez, he had never placed any such order and was uninterested in obtaining computers for his business.
 
 
 15
 . Co-defendants Craig Shape and Brian Ridgeway, as well as witness Charlene Ball, testified to discussions with Estevez about the quality of cocaine, receipt of drugs in Estevez's presence, and other indications that Estevez was part of the conspiracy. But co-defendant John Ridgeway testified that he had never engaged in a drug deal with Estevez, and that a different individual, not Estevez, delivered the five kilograms of cocaine to Tarini. (At sentencing, Thomas Tarini testified that Ridgeway was confused by a buy sheet which actually related to a different transaction, and that Estevez in fact had delivered the five kilograms in question to Tarini. Since Tarini did not testify at trial, however, the jury did not hear this version and our review of the jury's verdict cannot take it into account.)
 
 
 16
 . Motel, phone, and credit card records placed Estevez in Columbus at the times and places indicated by co-defendants, corroborating both their testimony about his membership in the conspiracy and his presence in the area at the right times. The government suggested that the records showed that Estevez switched motels frequently, and even bought one-way plane tickets, in order to "conceal his whereabouts."
 
 
 17
 On appeal, the standard of review for claims of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." U.S. v. Evans, 883 F.2d 496, 501 (6th Cir.1989) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in original).
 
 
 18
 It may be that a rational jury could have believed Estevez. But a rational jury could also have found the other witnesses more credible than Estevez. Moreover, the jury need not have disbelieved the Burger King executive, or the computer "cover story," in order to convict Estevez. Quite possibly, the jury believed that Estevez had a legitimate computer business and also ran drugs, and that he ran them where he had cover and convenient travel opportunities: Columbus, Ohio, and perhaps other cities in which he was purveying computer-related services and equipment.
 
 
 19
 The jury apparently disbelieved Estevez's explanation of how his fingerprint came to be on the cocaine, as well as why Thomas Tarini was paying him in cash. While some of the testimony against Estevez came from co-defendants with a reason to lie, the jury apparently believed them and not Estevez. Issues of witness credibility are for the jury to determine. U.S. v. Schultz, 855 F.2d 1217, 1221 (6th Cir.1988).
 
 III. Rebuttal Witness
 A.
 
 20
 Estevez's defense centered on his explanation that he was engaged to supply computer equipment and services to the Tarinis, and that the cash he received from Thomas Tarini on the night of November 11-12, 1991, was a down payment. It was presumably damaging to this defense when the government called Richard Tarini (the father) as a rebuttal witness to testify that he had not ordered any equipment or services from Estevez and had not authorized the payment of $30,000 or any other amount of money. The government's strategy was to portray Richard Tarini as a poor man set in his pre-computer ways, who had no interest in computers and moreover did not have the money to engage in the computer deal Estevez depicts.
 
 
 21
 On cross-examination, Estevez attempted to question Richard Tarini about his access to illegal cash from drug deals. Richard apparently laundered drug cash for his son Thomas, and Estevez was attempting to show that Richard Tarini did in fact have enough money to buy computers from Estevez, and to explain why Thomas Tarini gave Estevez cash that night.
 
 
 22
 Richard Tarini repeatedly invoked his Fifth Amendment privilege against self-incrimination in refusing to answer questions about his own drug-related activities. As a result, Estevez moved to have Tarini's entire testimony stricken on the ground that Estevez was unable to cross-examine Tarini on his rebuttal of Estevez's own story.
 
 
 23
 The district court refused to strike Richard Tarini's testimony because it found that the testimony Estevez wanted to elicit went only to Tarini's credibility as a rebuttal witness, not to any substantive matter such as an element of the offense.
 
 
 24
 The government claims that its examination of Richard Tarini was to establish that he was too old-fashioned to be interested in computers, not that he was too poor to afford them. The government therefore suggests that the questions Tarini refused to answer were immaterial to the government's use of him as a rebuttal witness. Moreover, the government argues, Estevez was able to introduce evidence that Tarini could afford computers--primarily tax returns showing million-dollar income in one year and direct testimony about that income--so that Estevez was not prejudiced by his inability to obtain other answers from Tarini. Estevez counters that he was prejudiced because the government focused on Tarini's poverty and all the evidence of Tarini's large income was offset by testimony of low profits.
 
 B.
 
 25
 The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." This privilege includes the right of a witness not to answer questions which might expose that witness to criminal liability.
 
 
 26
 The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." This right includes the opportunity to cross-examine a prosecution witness as to the elements of that witness's direct testimony. See Davis v. Alaska, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested").
 
 
 27
 There is no question in this case that the trial court properly allowed Richard Tarini to invoke his Fifth Amendment privilege against self-incrimination. But circumstances like those in the instant case require a court to determine whether the witness's invocation of that privilege prejudices the defendant's right to cross-examine him. If so, a court must strike the witness's entire testimony and instruct the jury to disregard it. In U.S. v. Gullett, 713 F.2d 1203 (6th Cir.1983), cert. denied, 464 U.S. 1069 (1984), this court explained how this determination is to be made:
 
 
 28
 When a witness has properly invoked the privilege against self-incrimination, the question of whether to strike the witness' direct testimony turns on whether the defendants' inability to complete their inquiry created a "substantial danger of prejudice by depriving [them] of the ability to test the truth of the witness' direct testimony." If assertion of the privilege precludes inquiry into matters which involve elements or specific events of the crimes charged, there may be substantial danger of prejudice in not allowing the defendants to test the truth of the witness' direct testimony. In that case, all or part of the witness' direct testimony should be stricken. If, however, the invocation of the privilege merely precludes inquiry into collateral matters which bear only on the general credibility of the witness, there is little danger of prejudice to the defendant, and, therefore, the witness' direct testimony need not be stricken.
 
 
 29
 Id. at 1208-09 (internal citations omitted) (emphasis added).
 
 
 30
 In Gullett, a prosecution witness testified to his involvement with the defendant in a money-laundering scheme. The witness testified that he used cash obtained in the scheme to bribe other individuals, but he was allowed to assert the privilege when the defense asked him to name those individuals. This court found that the witness's direct testimony need not have been stricken because the questions he would not answer went to collateral matters. The court explained that the witness had not testified on direct examination that he actually bribed anyone, so his refusal to name the bribees did not prevent the defense from testing the direct testimony; and that the crime charged against the defendant did not require the government to show an act of bribery, so that the witness's refusal "did not preclude the defense's inquiry into matters involving elements or specific events of the crimes for which the defendants were being tried." Id. at 1209. Moreover, defense counsel stated at trial that the purpose of the unanswered question was to undermine the witness's credibility. Furthermore, the defense had ample opportunity to attack the witness's character and motivation for testifying because the witness admitted complicity in the illegal scheme and admitted that he had entered into a plea agreement with the prosecution and was seeking leniency in exchange for his cooperation. Id.
 
 C.
 
 31
 The instant case presents more difficult circumstances than did Gullett. Richard Tarini did not admit to any wrongdoing or plea agreement with which he could be impeached. The questions he refused to answer, arguably, were more likely to implicate elements or events of the crimes charged because they went to the source and purpose of the cash given to Estevez by Thomas Tarini, supposedly in payment for drugs delivered, and thus to the heart of Estevez's defense that he was in Columbus dealing with the Tarinis as a legitimate computer salesman. We are sympathetic, therefore, to Estevez's complaint that "the Government got to have it both ways by using a 'clean' witness on rebuttal, yet ... limiting [Estevez's] inquiries into the witness's real activities."
 
 
 32
 In light of all the circumstances, however, we believe that the trial court did not abuse its discretion in determining that the line of questions Estevez sought to have Richard Tarini answer went mainly to collateral matters of credibility, and that Tarini's refusal to answer did not seriously prejudice Estevez's right to test the truth of Tarini's direct testimony.
 
 
 33
 First, the government did not ask Richard Tarini about his own drug activities. Had it done so, Estevez would clearly have been entitled to have answers to his own questions or to have the direct testimony struck.
 
 
 34
 Second, Estevez's counsel himself indicated at trial that his intent in asking the questions was to undermine Richard Tarini's credibility (Chambers Conference, Record at IV-165; Cross-Examination of Richard Tarini, R. at IV-174, 175, 189).
 
 
 35
 Third, although the government clearly aimed to portray Richard Tarini as both uninterested in computers and too poor to afford them, Estevez did have a significant opportunity to establish that Tarini could afford them. Estevez was able to use Tarini's tax returns and direct testimony to show that Tarini had substantial business income during two recent years and in excess of $1 million during a third (Cross-Exam. of R. Tarini, R. at IV-177-79). Although other testimony indicated that in spite of that gross income Tarini's profits were low, this did not necessarily indicate that he could not afford $30,000 worth of computers.
 
 
 36
 Fourth, the unanswered questions would have done nothing to rebut Tarini's professed lack of interest in computers. On this point it was his word against Estevez's, a determination solely in the province of the jury to make.
 
 
 37
 Fifth, to the extent that Estevez wanted to discredit Tarini by showing that he was involved in illegal drug activities such as laundering his son's drug proceeds, this went to Tarini's credibility and was not a ground for excluding the direct testimony.
 
 
 38
 Sixth, the jury heard and saw Richard Tarini "take the Fifth" not once but five times, with his own lawyer at his side (Cross-Exam. of R. Tarini, R. at IV-173-74, 183). In fact, the trial court attempted several times to move defense counsel along to other subjects after Tarini had asserted the privilege, but counsel succeeded in eliciting for the jury scenes such as the following:
 
 
 39
 Q. Did you launder money for your son's cocaine business through your restaurants and through your cement business?
 
 
 40
 [Prosecutor]: Object to this line of questioning.
 
 
 41
 [Defense counsel]: Your Honor, it goes to bias.
 
 
 42
 The Court: Well, overruled.
 
 
 43
 A. On the advice of my lawyer, I'll take the Fifth Amendment.
 
 
 44
 Q. Are you going to take the Fifth Amendment to every question that I ask you about your criminal involvement with your son?
 
 
 45
 A. Yes.
 
 
 46
 Q. Is that the old-fashioned way of doing it, sir?
 
 
 47
 A. I take the Fifth.
 
 
 48
 (Cross-Exam. of R. Tarini, R. at IV-174)
 
 
 49
 Although Tarini had a right not to incriminate himself, it is reasonable to assume that the jury's judgment of his credibility was influenced by his repeated refusal, with his lawyer whispering in his ear, to answer questions as to his own criminal activities.
 
 
 50
 Finally, Richard Tarini's direct testimony as a rebuttal witness was not the only or primary evidence in this case. It did operate to discredit Estevez's defense, but in the context of all the evidence, as recited in Section II above, even the potential prejudice to Estevez of Tarini's invocation of the privilege was not nearly as large as Estevez claims. Moreover, as we have just explained, we think the actual prejudice was minimal at most. We are not merely finding "harmless error"; this factor weighs on the side of our finding that there was "little danger of prejudice to the defendant, and, therefore, the witness' direct testimony need not [have] be[en] stricken." Gullett, 713 F.2d at 1209.
 
 IV. False Testimony
 
 51
 Estevez contends that the prosecution knew that statements by its witness Craig Shape were actually false. At trial Shape testified that he had carried money to Florida on behalf of Thomas Tarini; at sentencing, the probation officer testified that Shape had told him he never made such a trip. Thomas Tarini's testimony at sentencing also contradicted at least some of the details of Shape's trial testimony about the trip.
 
 
 52
 The district court refused to grant a new trial because it found that "this is not a case in which it is clearly established that false testimony concerning a material matter was presented to the jury." The court concluded that the prosecution did not know which of Shape's stories was true; that the prosecution had turned over Shape's Presentence Investigation Report, which contained the second version of his story and which the defense used to impeach Shape; and that Shape's testimony was but one piece in many days of evidence (Order, May 20, 1993, at 5-8).
 
 
 53
 We agree with the district court that, far from the government putting Shape's testimony on in bad faith, the evidence suggests that the government disclosed what it knew about Shape's inconsistency and that Estevez was not prejudiced by the government's actions. Estevez has failed to establish any of the three elements of a "false testimony" claim: that the statements were actually false, that they were material, and that the prosecution knew they were false. U.S. v. O'Dell, 805 F.2d 637, 641 (6th Cir.1986), cert. denied, 484 U.S. 859 (1987).
 
 V. Newly Discovered Evidence
 
 54
 Estevez also argues for a new trial on the ground that the sentencing testimony of the probation officer and of Thomas Tarini, both of whom contradicted Shape's testimony about the Florida trip, constituted newly discovered evidence.
 
 
 55
 The district court rejected this argument on the ground that the "new evidence" was "cumulative impeachment evidence." Although the probation officer's notes and testimony were not available at trial, his report summarizing Shape's other version of the trip was, and Estevez used it to impeach Shape (see Section IV above). Although Thomas Tarini's testimony was not available at trial, it contradicted Shape only in some details and would have left the jury with the belief that Shape took some amount of money to Florida for Tarini to buy some amount of cocaine from Estevez. Finally, in light of all the other testimony, the court concluded, the "new evidence" would not likely have led to Estevez's acquittal.
 
 
 56
 The district court handled this claim appropriately. Estevez was not denied the opportunity to present to the jury Shape's two versions of the trip, thus casting doubt on Shape's credibility. Shape was only one of several witnesses to the conspiracy and had nothing to say about the physical evidence in the case. Therefore, even if the evidence was "new," which is not clear, the district court was correct that it was cumulative and would not likely have changed the result. Estevez has therefore failed to establish at least two of the four elements required to justify a retrial based on newly discovered evidence. U.S. v. Knipp, 963 F.2d 839, 847 (6th Cir.1992).
 
 VI. Prosecutorial Misconduct
 
 57
 Estevez alleges three instances of prosecutorial misconduct. The district court denied Estevez's motion that these were sufficient to warrant a mistrial.
 
 
 58
 We agree with the district court. None of these three instances are highly prejudicial or rise to the kind of egregious or systematic misconduct which would constitute "foul blows" and warrant a new trial. U.S. v. Steinkoetter, 633 F.2d 719, 720 (6th Cir.1980). In the first instance, during his cross-examination of Estevez's father the prosecutor told the witness what he would find on a motel record and supplied the witness with a name he was trying to elicit. These are minor transgressions, and the court properly admonished the prosecutor about the second.
 
 
 59
 Second, in questioning Estevez's father about Estevez's first cousin, Alex Marrero, the prosecutor referred to Marrero's "difficulty" (a conviction for selling information relating to federal drug investigations, plus a famous trial for shooting a black motorcyclist in Miami). Estevez objected to this attempt to "smear" him by association before Marrero's "difficulty" could be explained to the jury. The jury never heard about the conviction or the trial. Moreover, the court found that neither the court nor the jury had any idea who Marrero was, so that Estevez was not prejudiced.
 
 
 60
 Third, when Estevez cross-examined Craig Shape about the evidence in Shape's Presentence Investigation Report that Shape had told the probation officer a different story about the trip to Florida, the prosecutor objected in front of the jury to Estevez's "misstatement of fact" and said that Estevez's counsel had "mischaracterized [the Report] on purpose." Estevez calls this "defamatory" and a "vicious attack." In truth, the prosecutor was wrong about the contents of the Report, and the court admonished him and stated that Estevez had correctly characterized the Report. The court thus corrected the error and eliminated any prejudice.
 
 VII. Drug Quantity
 
 61
 The probation officer originally believed that Estevez was responsible for 49 kilograms of cocaine but limited his finding to 17 kilograms (Sent. Tr. June 24, 1993, at 47-49). At sentencing, the court attributed 9 kilograms of cocaine to Estevez (Sent. Tr. June 24, 1993, at 57). The court found that this was a "conservative" and careful estimate, stating that it was "approaching the issue in a conservative manner and one which gives the defendant the benefit of any doubt [the court] may have."
 
 
 62
 The court determined that Estevez (1) supplied the five kilograms to Thomas Tarini on November 11, 1991; and (2) supplied at least one kilogram to Tarini in each of four months in 1991. The court based its determination primarily upon sentencing testimony provided by Tarini. While Tarini's credibility was heavily impeached by Estevez's counsel, the court believed Tarini.
 
 
 63
 Estevez characterizes the drug quantity calculations as the court's guesswork on top of Thomas Tarini's guesswork. But the court seems to have calculated conservatively for just this reason--again, rejecting the Probation Officer's finding of 17 kilograms, and settling on 9.
 
 
 64
 Estevez points out that he was acquitted both of possessing the 5 kilograms delivered on November 11, 1991, and of using the telephone to do so. However, this court has previously found that the standard of proof at sentencing ("preponderance of the evidence") is lower than at trial ("beyond a reasonable doubt"). U.S. v. Silverman, 976 F.2d 1502, 1513 (6th Cir.1992) (en banc), cert. denied, 113 S.Ct. 1595 (1993). This court has also found that even acquitted conduct may be found to be "relevant conduct" for the purposes of sentencing. U.S. v. Lloyd, 10 F.3d 1197, 1221 (6th Cir.1993), petition for cert. filed (U.S. March 7, 1994) (No. 93-8327). Furthermore, the government also points to a "buy sheet" that the jury may have erroneously believed showed that someone other than Estevez delivered the 5 kilograms to Thomas Tarini. Tarini, who did not testify at trial, testified at sentencing that this "buy sheet" was for a different transaction and that Estevez had in fact delivered the 5 kilograms. This might explain why the jury acquitted Estevez on the possession count but the court found him responsible for those 5 kilograms at sentencing. On the basis of this evidence, therefore, the court could have found by a preponderance of the evidence that Estevez was responsible for 9 kilograms of cocaine.
 
 VIII.
 
 65
 For the reasons set forth above, we AFFIRM Jose Estevez's conviction and sentence.
 
 
 66
 This case is not recommended for publication in the Federal Reporter.