RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0069p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KATHARINE E. MATTHEWS (20-6156); ROBERT EARL WALLACE (20-6181),

*Defendants-Appellants*.

Nos. 20-6156/6181

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:17-cr-00118—Karen K. Caldwell, District Judge.

Decided and Filed:  April 11, 2022

Before:  SUHRHEINRICH, STRANCH, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Eric G. Eckes, PINALES STACHLER YOUNG BURRELL, L.P.A., Cincinnati, Ohio, William R. Gallagher, Elizabeth Conkin, ARENSTEIN & GALLAGHER, Cincinnati, Ohio, for Appellant in 20-6156.  Steven R. Jaeger, THE JAEGER FIRM PLLC, Erlanger, Kentucky, for Appellant in 20-6181.  Javier A. Sinha, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., Roger West, William P. Moynahan, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

---

**OPINION**

---

SUHRHEINRICH, Circuit Judge.

When Robert Carlson stopped selling computer systems and started running drugs, he persuaded some of his friends to help. Between March 2014 and April 2017, together they trafficked about 1,680 kilograms of cocaine, 2,050 pounds of marijuana, and 40 pounds of methamphetamine—and between $500 million and $1 billion of cash in drug proceeds—for the Sinaloa Mexican drug cartel. The gig ended when Carlson got caught and turned in his co-conspirators, including both appellants here, Katharine E. Matthews and Robert Earl Wallace.

Matthews was convicted on three conspiracy counts (two for drug distribution, one for money laundering) following a lengthy jury trial. She raises a variety of arguments now: whether her convictions were based on sufficient evidence; whether the district court erred in providing a deliberate-ignorance jury instruction; whether her confrontation rights were violated after the court allowed Carlson to invoke his privilege against self-incrimination as to certain questions on cross-examination; and whether she was prejudiced by a variance between the indictment and proof at trial on Count 1 (conspiracy to distribute cocaine and methamphetamine). Wallace pleaded guilty to Count 1 and received a below-Guidelines sentence of 60 months' imprisonment, which he argues is procedurally and substantively unreasonable. Because their arguments lack merit, we affirm.

**I.**

Carlson's scheme was straight-forward: he and his co-conspirators were couriers for the Sinaloa Mexican drug cartel, trafficking drugs and drug proceeds on private airplanes between California and cities throughout the United States. Cartel members would deliver the drugs in California to Carlson, Matthews, or others. The cartel packaged the cocaine in plastic-wrapped bundles. Matthews or others counted those bundles, packed them into suitcases, and then loaded the suitcases onto a private plane that they had chartered, which flew across the country with

Carlson, Matthews, or others in tow. After reaching their destination, they unloaded the drugs from the plane and delivered them to cartel members.

Although cocaine was the primary drug that Carlson trafficked, he also trafficked marijuana and, for a short time toward the end of the scheme, methamphetamine. A "typical" trip moved about 80 to 120 kilograms of cocaine. Only two flights carried methamphetamine, but both of those flights also carried cocaine.

Aside from the drugs, the cartel also tasked Carlson and his friends with bringing cash drug proceeds back to California on their return flights. Like the cocaine, the cartel packaged its cash in plastic-wrapped bundles, which obscured what was inside—although, according to Carlson, the bundles still appeared to contain "some colored, sort of blue-green paper that looked like currency." Carlson, Matthews, or others would then count the number of cash bundles. If Carlson wasn't there, whoever was—including Matthews, on several occasions—would also send a picture of the bundles to Carlson to ensure they had "an accurate count . . . so [they] wouldn't be responsible if it was short." They would then pack the cash bundles into suitcases, load them onto the plane, return to California, and deliver the cash proceeds to the cartel.

The cartel then paid Carlson for his services. He would use that money to cover the conspiracy's expenses—hotel rooms, chartered planes, and aircraft fuel. Carlson's co-conspirators would also get a cut, an amount that "depend[ed] on their role." Because Carlson and Matthews were "partner[s]" in the drug-trafficking scheme, he paid her "usually at least $5,000 a trip, minimum," and Carlson would keep "at least that much" for himself. Matthews ultimately made over $100,000 through the conspiracy. Co-conspirators with a less substantial role—*e.g.*, those whom Carlson asked "to come on the plane to make it look like we were a group of people traveling with luggage"—would receive less, "typically" $2,000 to $3,500 per trip.

The law eventually caught up to Carlson, and he turned in his co-conspirators. A grand jury in the Eastern District of Kentucky returned a superseding indictment against seven defendants: Robert Chipperfield, Jr., Torrey Ward, David Arthur Corona Diaz, Kendra Michelle

Caprice Talley, and Nader Sarkhosh, as well as the two appellants here, Matthews and Wallace.[1] The three-count indictment charged all seven defendants with conspiracy to distribute five kilograms or more of cocaine and 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1) (Count 1); conspiracy to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1) (Count 2); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 3).

Matthews was tried alongside Chipperfield, Ward, and Sarkhosh—three pilots who, like Wallace, flew trips for Carlson. The ensuing multi-week jury trial featured the testimony of, among others, Carlson (including three days of his cross-examination) and co-conspirator Cedric Fajardo, as well as reams of text messages, photos, and banking records created during the scheme.

Matthews testified in her own defense, arguing that she never knew Carlson was trafficking drugs and therefore did not knowingly join the conspiracy. The government presented text messages between her and Carlson that, although at times cryptic, tended to show otherwise—especially after Carlson explained their meaning. Over the defendants' objections, the district court instructed the jury about how the government may prove knowledge through a defendant's deliberate ignorance—an instruction that was based verbatim on this court's pattern instruction. *See* Sixth Circuit Pattern Crim. Jury Instructions 2.09 (2021).

The jury convicted Matthews on all three counts—although it found, as to Count 1, that no quantity of methamphetamine trafficked during the conspiracy was directly attributable to Matthews. It acquitted the three pilots on all counts.

Following the verdict, Matthews moved for a judgment of acquittal on all counts and for a new trial. She argued that insufficient evidence supported her convictions, that the government failed to prove venue for Count 2 (conspiracy to distribute marijuana), and that there was a variance between her indictment and the proof at trial. Her new-trial motion argued that her convictions were against the manifest weight of the evidence. The district court granted in part

---

[1]Carlson was charged in a separate case.

the motion for acquittal, finding that the government failed to prove venue for Count 2. It otherwise denied that motion and the motion for a new trial.

For his part, Wallace—who was one of Carlson's pilots on several trafficking trips—pleaded guilty to Count 1 in exchange for the dismissal of Counts 2 and 3; the district court gave him a below-Guidelines sentence of 60 months' imprisonment, followed by five years' supervised release. Both Matthews and Wallace timely appealed. We address Matthews's challenges to her convictions first, then turn to Wallace's appeal of his sentence.

## II.

### A. Sufficiency and Manifest Weight of the Evidence

Matthews argues that the court erred in denying her post-verdict motion for judgment of acquittal because her convictions for Counts 1 (conspiracy to distribute cocaine and methamphetamine) and 3 (conspiracy to commit money laundering) were based on insufficient evidence. She likewise argues the court erred in not granting a new trial because her convictions were against the manifest weight of the evidence.

#### *1. Sufficiency of the Evidence*

We review the denial of a motion for judgment of acquittal de novo, *United States v. Collins*, 799 F.3d 554, 589 (6th Cir. 2015), "draw[ing] all reasonable inferences, including inferences from circumstantial evidence, in favor of the government," *United States v. Acosta*, 924 F.3d 288, 296–97 (6th Cir. 2019). A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Start with the elements of conviction for Count 1. To prove a drug conspiracy under 21 U.S.C. §§ 846, 841(a)(1), the government must prove "(1) an agreement to violate the drug laws, and (2) each conspirator's knowledge of, intent to join, and participation in the conspiracy." *United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001). Matthews takes aim at

the second element—arguing the government failed to prove that she "had knowledge of and intended to join the conspiracy alleged in Count 1."

There was sufficient evidence for the jury to conclude that Matthews knew of and intended to join the conspiracy. The government sought to prove its case primarily through the testimony of, among others, Carlson and another co-conspirator, Fajardo, as well as through documentary evidence that corroborated their testimony. Key parts of that evidence follow.

Carlson testified that he trafficked "[t]housands of kilos of cocaine" throughout the conspiracy, and that Matthews was his "partner" in the scheme "when [they] started this in 2014." He further testified as to Matthews's role: when she went on the trips, she picked up the bundled drugs from the cartel, counted the bundles, delivered them to the cartel, received the cartel's cash, then transported the cartel's cash back on the plane and delivered it to another member of the cartel. In exchange, Carlson paid Matthews "at least $5,000 a trip, minimum."

Fajardo described several trips that he and Matthews went on together. He knew that the bundles he and Matthews received from the cartel contained cocaine. He explained that he and Matthews counted those bundles of cocaine, packed them into suitcases, transported those suitcases to Georgia on a private plane, delivered the cocaine, received suitcases full of bundles of cash, and then flew back on a private plane with that money.

The government's documentary evidence was even more telling. Text messages between Matthews and Carlson showed that, on one trip in February 2017, Matthews was dropping off a delivery of cocaine when a cartel member discovered that two bundles of cocaine were missing. Although the text messages described the cocaine bundles as "units," Carlson later explained that "unit" means "[a] kilo of cocaine." Matthews discovered that neither her nor Carlson was to blame for the missing kilos: she texted Carlson that the cartel member to whom she made the drop-off "knows it's not us, it's the boys that packed them"—meaning, as Carlson explained, that the cartel members who packed the kilos into the suitcases must have miscounted.

Viewing this evidence in the light most favorable to the government, a rational jury could have concluded that Matthews knew of, intended to join, and agreed to participate in, Count 1's drug-trafficking conspiracy.

As for Count 3, the money-laundering conspiracy, 18 U.S.C. § 1956(h), the government was required to prove "(1) that two or more persons conspired to commit the crime of money laundering, and (2) that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Powell*, 847 F.3d 760, 781 (6th Cir. 2017) (quotations omitted). No overt act is required. *See United States v. Bazazpour*, 690 F.3d 796, 802 (6th Cir. 2012) (citing *Whitfield v. United States*, 543 U.S. 209, 219 (2005)). The substantive crime of money laundering, in turn, requires the government to prove that the defendant "(1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew the property involved was proceeds of unlawful activity;" and (3) either "intended to promote that unlawful activity" or "[knew] that the transaction is designed in whole or in part to disguise the . . . source, ownership or control of the proceeds." *United States v. Warshak*, 631 F.3d 266, 317, 320 (6th Cir. 2010) (quotations omitted).

As with Count 1, Matthews challenges the knowledge element, but there was sufficient evidence from which a rational jury could infer that Matthews knew that she handled the proceeds from unlawful activity and that she agreed to promote that activity.

Matthews agreed to conduct financial transactions that she knew involved the proceeds of unlawful activity. Namely, she received and transported the cartel's cash bundles after delivering the drug bundles, counted and photographed them, and delivered that cash to members of the cartel in exchange for payment. After receiving from the cartel the payment for a trip, Matthews agreed to bring Carlson's cut to him. As we have held when interpreting the relevant statutory definitions, the delivery of the cash proceeds of unlawful activity to another person qualifies as a "financial transaction" within the meaning of the money laundering statute. *United States v. Reed*, 77 F.3d 139, 142–43 (6th Cir. 1996) (en banc). Matthews's delivery of cash to Carlson constitutes a "financial transaction" for purposes of the crime of money laundering.

And a rational jury could conclude that Matthews knew Carlson was trafficking proceeds from unlawful activity. For example, text messages introduced at trial showed that, after a pilot grew suspicious of Carlson during a trip to Miami, Carlson lied by saying he transported only *cash* on the flight. To explain his heavy luggage on the return flight, Carlson planned to tell the pilot that he was also transporting cash back home. But Matthews helped Carlson develop a

story that (she thought) seemed less suspicious, texting Carlson: "You brought cash [in] exchange for cash? That sounds sketch. . . . [Y]ou could say it's two different clients. One had you bring cash to someone in Miami, and then another client is having you pick up money to bring back." The jury was entitled to infer from this that Matthews knew Carlson was handling illicit proceeds.

A rational jury also could conclude that Matthews intended to promote (and took actions that in fact promoted) the conspiracy's unlawful activity. For one thing, she picked up Carlson from the airport after that Miami trip. She also took other steps that promoted the conspiracy, including paying co-conspirators, picking up the tab for jet fuel, and managing payments that the cartel owed to co-conspirators—texting Carlson on one occasion that "[Luis, from the cartel,] still owes us 23K." And it makes sense why Matthews would promote the scheme: Carlson paid her for every trip that occurred—even those that Matthews didn't go on—because, in his words, "we were partners."

Viewing this evidence in the light most favorable to the government, a rational jury could have found that Matthews knew of and intended to promote the money-laundering conspiracy. And a jury could have concluded, from these actions, that she agreed to join Carlson's money-laundering conspiracy.

Matthews's counterarguments (which relate to both the cocaine and money-laundering conspiracies) are unconvincing. Her primary argument is that there was no objective evidence showing she actually knew Carlson was trafficking drugs or drug proceeds. But the government was not required to produce a smoking gun. Rather, "[a] conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997) (quotations omitted). Matthews's "behavior permitted the jury to draw such an inference." *United States v. Elliott*, 876 F.3d 855, 863 (6th Cir. 2017).

She also tries relitigating Carlson's credibility—arguing that "virtually every time Carlson opened his mouth, something different came out." She argues the same as to Fajardo. For purposes of Matthews's motion for acquittal, however, credibility was an issue for the jury to

decide. *United States v. Graham*, 622 F.3d 445, 449 (6th Cir. 2010) ("We may not rule on a challenge to witness credibility in reviewing the denial of a motion for acquittal . . . ."). Although Matthews testified in her own defense that she was never Carlson's partner in a drug or money-laundering conspiracy, the jury was entitled to credit Carlson's and Fajardo's testimony over hers. And it's worth noting that the district court instructed the jury to "consider . . . with more caution" Carlson's and Fajardo's testimony because they were cooperating with the government.

To the extent that Matthews argues Carlson's and Fajardo's testimony was uncorroborated and therefore legally insufficient, she is wrong. "[I]t is well-settled that uncorroborated testimony of an accomplice may support a conviction in federal court." *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999). At any rate, we have more than uncorroborated testimony here—Carlson's testimony was backed up by Matthews's own text messages to him, photographs of bundles of cash that Matthews sent to Carlson, hotel confirmations for stops that Matthews made during the trips, and Matthews's banking records.

Accordingly, the district court did not err in denying Matthews's motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29.

### 2.     *Manifest Weight of the Evidence*

Matthews also appeals the district court's denial of her motion for a new trial, which argued that her convictions were against the manifest weight of the evidence. A trial judge faced with such a motion must "take on the role of a thirteenth juror, weighing evidence and making credibility determinations firsthand to ensure there is not a miscarriage of justice." *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018). That does not mean, however, that *this* court sits as a thirteenth juror and can reweigh the evidence. *See United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988). Rather, its review "is limited to determining whether [the trial court's ruling] was a clear and manifest abuse of discretion." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007).

There was no abuse of discretion, let alone a clear and manifest one. The district court correctly acknowledged that it could "weigh the evidence and assess the credibility of witnesses

in the role of a thirteenth juror." Applying that standard, the court rejected Matthews's arguments that Carlson and Fajardo were not credible; it instead found that their testimony was corroborated by documentary evidence. Considering the evidence described above, the court's denial of Matthews's motion was not a clear and manifest abuse of discretion.

Accordingly, the district court did not err in denying Matthews's motion for a new trial under Federal Rule of Criminal Procedure 33.

### B.       Deliberate-Ignorance Jury Instruction

Matthews next claims that the district court erred in providing a deliberate-ignorance instruction to the jury. That instruction said, in effect, that the jury could conclude that Matthews knew Carlson was trafficking drugs and drug proceeds if it found that she deliberately ignored that fact. This instruction was erroneous, according to Matthews,[2] because it wrongly allowed the jury to find that she intended to join the conspiracy, rather than merely that she knew of the unlawful aims of the conspiracy.

We review jury instructions for an abuse of discretion, and we will not reverse unless "the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Williams*, 612 F.3d 500, 506 (6th Cir. 2010) (quoting *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008)).

Courts may provide a deliberate-ignorance instruction when a defendant claims that he was oblivious to what was obvious. "[S]ometimes called the 'ostrich instruction,' . . . [t]he instruction explains to the jury that knowledge . . . also includes the deliberate avoidance of knowledge." *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012). The "instruction is warranted to 'prevent[] a criminal defendant from escaping conviction merely by deliberately closing his eyes to the obvious risk that he is engaging in unlawful conduct.'" *United States v. Geisen*, 612 F.3d 471, 485–86 (6th Cir. 2010) (alteration in original) (quoting *United States v. Gullett*, 713 F.2d 1203, 1212 (6th Cir. 1983)). It "is not a standard less than knowledge"—but

---

[2]Matthews does not challenge the district court's conclusion that there was an adequate evidentiary basis for the instruction, so we do not decide that issue. *See United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012) (noting the two factual predicates that warrant a deliberate-ignorance instruction).

"simply another way that knowledge may be proven." *Mitchell*, 681 F.3d at 877 (quoting *United States v. Severson*, 569 F.3d 683, 689 (7th Cir. 2009)).

However, we have cautioned "that the instruction ought to 'be used sparingly.'" *Id.* at 876 (quoting *Geisen*, 612 F.3d at 486). As Matthews correctly observes, the instruction may be "offered to prove [a conspirator's] *knowledge of the aims of the conspiracy*, [but] not to prove *the existence of an agreement*." *United States v. Warshawsky*, 20 F.3d 204, 211 (6th Cir. 1994). She claims that the instruction here violated that rule by allowing the jury to find the latter from the former. We disagree.

The district court here provided the following deliberate-ignorance instruction, which was based nearly verbatim on our pattern[3] instruction:

> Now I want to talk to you about proving a defendant's knowledge. No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you're convinced that the defendants deliberately ignored a high probability that they were participating in the *delivery of controlled substances, such as cocaine, methamphetamine, marijuana, and the proceeds from the sale of such controlled substances by private aircraft* across the United States, then you may find that they knew they were participating in the *delivery of a controlled substance, such as cocaine, methamphetamine, marijuana, and the proceeds from the sale of such controlled substances by private aircraft* across the United States.
>
> But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that they were participating in the *delivery of controlled substances, such as cocaine, methamphetamine, marijuana, and the proceeds of the sale of such substances by private aircraft*, and that the defendants deliberately closed their eyes to what was obvious. Carelessness or negligence or foolishness on his or her part is not the same as knowledge and is not enough to convict. This, of course, is for you to decide.

---

[3]The pattern instruction reads, in full:

    (1) Next, I want to explain something about proving a defendant's knowledge.

    (2) No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that the defendant deliberately ignored a high probability that _____, then you may find that he knew _____.

    (3) But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that _____, and that the defendant deliberately closed his eyes to what was obvious. Carelessness, or negligence, or foolishness on his part is not the same as knowledge, and is not enough to convict. This, of course, is all for you to decide.

Sixth Circuit Pattern Jury Instruction 2.09 (2021).

On its face, the instruction permitted the jury to find only two facts from deliberate ignorance: whether Matthews knew she was "participating in the delivery of controlled substances . . . and the proceeds from the sale of such controlled substances." Delivery of those substances and the proceeds therefrom was the illegal aim of the conspiracy. The instruction made no mention of Matthews's intent to join the conspiracy or whether she deliberately ignored the existence of a criminal agreement; had it done that, we'd be forced to call foul. For example, we recently found error where the jury was instructed that, "if it found a defendant 'had deliberately ignored that [sic] a high probability that a *criminal agreement* existed,' it could 'find that *he knowingly and voluntarily joined that agreement.*'" *United States v. Evans Landscaping Inc.*, 850 F. App'x 942, 951 (6th Cir. 2021) (first emphasis added); *see also id.* at 951–52 (finding that this error, which was not objected to below, ultimately was "not likely to cause a grave miscarriage of justice"). The instruction here, however, came nowhere close to doing that.

Perhaps anticipating this, Matthews argues that the distinction on which we rely— between knowledge of the aims of a conspiracy and intent to join a conspiracy—becomes a "distinction without a difference in single aim conspiracy cases." She claims that "[h]er intent to enter a conspiracy to distribute illegal drugs was inextricably intertwined with knowledge of the aims of the conspiracy." She is wrong for three reasons.

First, that was just as true in *Warshawsky* as here: the Warshawskys' intent to enter a conspiracy to traffic stolen auto parts was inextricably intertwined with their knowledge that the auto parts were stolen. *See Warshawsky*, 20 F.3d at 210–11. We found no problem with that; actually, we rejected the underlying premise—noting that the use of a deliberate-ignorance instruction to establish that "the defendant knew the unlawful purpose of the conspiracy . . . is hardly inconsistent with a finding that the defendant intended to further the unlawful purpose." *Id.* at 211 (quoting *United States v. Inv. Enters., Inc.*, 10 F.3d 263, 269 (5th Cir. 1993)).

Second, to the extent Matthews argues that the deliberate-ignorance instruction is always improper in single-aim conspiracy cases,[4] precedent counsels otherwise. As explained in *Warshawsky*, we previously approved the deliberate-ignorance instruction in a drug-conspiracy

---

[4]She does not explain what she means by "single-aim conspiracy." Carlson's scheme arguably had multiple aims, both legal (*e.g.*, renting and flying planes) and illegal (*i.e.*, transporting drugs and drug proceeds).

case materially identical to Matthews's. *See United States v. Lee*, 991 F.2d 343, 349–51 (6th Cir. 1993). The defendant there claimed he had no idea that the bags he transported to Miami contained cash that would be used to purchase cocaine, *id.* at 350, and we "expressly approve[d]" the use of the deliberate-ignorance instruction in that context, *id.* at 351.

Third, the facts of this case drive those points home. Matthews is wrong, as a factual matter, that her specific intent to join and further Carlson's criminal enterprise was inextricably intertwined with her knowledge of what Carlson was trafficking. She undoubtedly agreed to help Carlson move briefcases and suitcases across the country; she requested payments for every trip that occurred, even those she did not go on herself; she met with members of the cartel; she counted drug and cash bundles; she sent pictures of those bundles to Carlson; and she accounted for payments owed to co-conspirators. She cannot credibly claim otherwise, nor does she attempt to. What she claims is that she had no idea that the plastic-wrapped bundles contained drugs and drug proceeds—because she deliberately avoided learning that fact. That fact, and that fact alone, is what the deliberate-ignorance instruction allowed the jury to find. We find no error in that.

And, to the extent Matthews argues that the instruction erred by not explicitly noting that deliberate ignorance may prove only knowledge of the aims of the conspiracy, she is wrong. Because the instruction was "clearly directed toward [Matthews's] knowledge of the aims of the conspiracy, the district court was not required to give a specific instruction directing the jury that it could not find [the existence of a] conspiracy based upon a deliberate ignorance theory." *United States v. Smigiel*, 173 F.3d 857, 1999 WL 196575, at *3 (6th Cir. Mar. 29, 1999) (unpublished table decision); *see also Williams*, 612 F.3d at 508 (quoting *Smigiel* for that proposition); *Warshawsky*, 20 F.3d at 211 n.3 (noting that the court need not decide whether a limiting instruction was required). The instruction, as explained above, was directed to only the aims of the conspiracy, so no limiting instruction was required.

Moreover, regardless of whether the deliberate-ignorance instruction was given in error, any error was harmless. An erroneous instruction is harmless "if its probable effect on the verdict was inconsequential." *United States v. Rayborn*, 491 F.3d 513, 520 (6th Cir. 2007) (quotations omitted). "[W]hen a district court gives a deliberate ignorance instruction that does

not misstate the law but is unsupported by sufficient evidence, it is at most harmless error, so long as there is sufficient evidence of the defendant's actual knowledge to support a conviction." *United States v. Ross*, 502 F.3d 521, 528 (6th Cir. 2007).

Extensive evidence showed that Matthews knew of Carlson's illegal activity and agreed to further it, as detailed above. To highlight a few points: Fajardo testified that Matthews counted bundles of cocaine, flew to Georgia to deliver that cocaine, picked up suitcases full of cash bundles, took pictures of the cash, and then delivered that suitcase to Carlson. Numerous text messages between Matthews and Carlson showed her discussing bundles of cocaine, drug proceeds, and payment. More to the point of whether she knowingly joined the conspiracy, Carlson testified that he paid Matthews for all trips—even ones she did not personally go on—because she was his partner. She also requested payments for such trips. A rational jury would have inferred from this evidence that Matthews knowingly and voluntarily joined Carlson's conspiracy—irrespective of the deliberate-ignorance instruction. Therefore, even if the instruction was given in error, it was harmless.

### C.    Confrontation Clause

Matthews next argues that her rights under the Confrontation Clause were violated because the district court allowed Carlson to invoke his Fifth Amendment privilege against self-incrimination as to certain questions on cross-examination.

We generally review a district court's evidentiary decisions for an abuse of discretion. *United States v. Holden*, 557 F.3d 698, 703 (6th Cir. 2009). To the extent the evidentiary decision turned on a "conclusion of law," we review it de novo. *United States v. Baker*, 458 F.3d 513, 516 (6th Cir. 2006) (quoting *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003)).

The government, however, argues that plain error should apply because "[n]o defendant objected below to Carlson's invocation of the privilege on Confrontation Clause grounds or moved to strike Carlson's direct testimony." In response, Matthews claims she "argued extensively on just that basis." We need not decide who's right, because Matthews loses even under de novo review.

"Although the Confrontation Clause protects a defendant's right to cross-examine witnesses, this right is not absolute.  Instead, the Constitution guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  *Jordan v. Warden, Lebanon Corr. Inst.*, 675 F.3d 586, 594 (6th Cir. 2012) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).  We have staked the bounds of the confrontation right accordingly: "cross-examination as to bias, motive or prejudice is constitutionally protected, but cross-examination as to general credibility is not." *Boggs v. Collins*, 226 F.3d 728, 737 (6th Cir. 2000).

Because a defendant's right to confront a witness on cross-examination is not absolute, that right "cannot overcome the witness'[s] privilege against self-incrimination, if properly asserted." *Gullett*, 713 F.2d at 1208–09.  And the privilege is properly asserted if, "in light of all the circumstances, the answer to a particular question would subject the witness to a real danger of further incrimination." *Id.* at 1208.

Here, Carlson testified on direct that he "moved" between $500 million and $1 billion for the cartel.  On cross-examination, a co-defendant's counsel sought to impeach Carlson by asking whether he paid taxes on that money.  Based on his counsel's prior advice, Carlson invoked the privilege against self-incrimination.  The court directed counsel to approach the bench and excused the jury as well as Carlson; during the sidebar that followed, the co-defendant's counsel explained she "intend[ed] to show that [Carlson] ha[d] not filed taxes in California," "ha[d] not paid his [federal] taxes," and had "presented a landlord, or someone offering him credit, with false [tax] documents that showed him having more income than he had."  She also intended to ask Carlson about an evidentiary proffer he made to the government, in which he requested, in exchange for his testimony, that the government not send the tax-based incriminating information to the IRS.

The court reasoned that Carlson could invoke the privilege as to the fraud-based and tax-based testimony because that would incriminate Carlson beyond his direct testimony.  Crucially, however, the court stated that Carlson could *not* invoke the privilege to avoid testifying about "his negotiations with the United States, . . . that they not send part of his case to the IRS," as

those negotiations did not "necessarily incriminate him, but [went] to his negotiating and his credibility with the government."

We find no error; Carlson had proper grounds for invoking the privilege, and the court properly limited that invocation to those grounds alone. His direct testimony boiled down to admitting that he and Matthews trafficked drugs and drug proceeds around the country. But cross-examination about the fraudulent documents would have incriminated him beyond what he admitted on direct—*i.e.*, on fraud-based crimes, not drug-trafficking crimes. Although such testimony may have had impeachment value, that "cannot overcome" Carlson's properly invoked privilege. *Gullett*, 713 F.2d at 1208–09.

The same goes for Carlson's testimony about his failure to pay taxes—which would have incriminated him on tax-based crimes, not drug-trafficking crimes. Matthews argues that Carlson waived the privilege by testifying on direct as to the amount of money he "moved" for the cartel. But that direct testimony said (at most) how much Carlson *earned* from the conspiracy—not whether he *failed to pay taxes* on those earnings. The testimony sought on cross-examination, however, took the extra step. Because it "carrie[d] a risk of incrimination beyond that raised by previous testimony," Carlson did not waive, and the court properly sustained, the privilege as to that testimony. *United States v. LaRiche*, 549 F.2d 1088, 1096 (6th Cir. 1977).

On the flipside, the court properly *limited* Carlson's invocation of the privilege—by consistently directing him to answer when asked whether the government "guarantee[d]" to not inform the IRS of the testimony he proffered to the government. Any such guarantee did not incriminate Carlson, but rather exposed his "bias, motive or prejudice" to lie for the government—a subject that Matthews had a constitutional right to question him about. *See Boggs*, 226 F.3d at 737. Accordingly, the court properly rejected Carlson's invocation of the privilege as to this testimony. And that gave Matthews ample opportunity to expose Carlson's motives and alleged bias on cross-examination. Such is enough to satisfy the Confrontation Clause. *See id.*

Matthews's counterarguments are insubstantial.  She vaguely suggests that the district court should have stricken Carlson's testimony on direct examination because of his invocation of the privilege on cross.  But that's the remedy only if a witness's invocation of the privilege prejudices the defendant's ability "to test the truth of the witness'[s] direct testimony."  *Gullett*, 713 F.2d at 1208.  For example, such prejudice is particularly likely where "assertion of the privilege precludes inquiry into matters which involve elements or specific events of the crimes charged."  *Id.*  If, however, invocation of the privilege "merely precludes inquiry into collateral matters which bear only on the general credibility of the witness, there is little danger of prejudice to the defendant, and, therefore, the witness'[s] direct testimony need not be stricken."  *Id.* at 1209.

Matthews was not prejudiced for two reasons: the testimony that was limited on cross-examination related only to Carlson's general credibility, and Matthews had ample opportunity to challenge that credibility throughout the rest of the cross-examination.  Again, Carlson's direct testimony amounted to admitting that he and Matthews ran a cross-country drug conspiracy.  But whether Carlson *paid taxes* on the money made from that scheme is not an "element[] or specific event[] of the crimes charged."  *Id.* at 1208.  Rather, that was a collateral matter—it went only to Carlson's general credibility.  Although that is a relevant and generally proper ground for cross-examination, it does not trump Carlson's properly asserted privilege against self-incrimination, as explained above.

More to the point, Matthews and the other defendants had ample opportunity—over Carlson's three-day-long cross-examination—to test the truth of Carlson's direct testimony and to attack his credibility.  Because the desired testimony went to a collateral issue, and because Matthews had ample opportunity to otherwise test Carlson's direct testimony and his credibility, she was not prejudiced by his assertion of the privilege.  Therefore, the district court was not required to strike Carlson's direct testimony.

Finally, Matthews relies on *United States v. Hatchett*, 918 F.2d 631, 641 (6th Cir. 1990), and *United States v. Jackson-Randolph*, 282 F.3d 369, 382 (6th Cir. 2002), for the proposition that failing to pay taxes is probative of a witness's credibility and therefore a permissible topic of cross-examination.  Fair enough.  But just because a line of questioning is probative and may be

elicited on cross-examination does not mean the witness waives all privileges as to that testimony. Put differently, neither case faced the issue here: where an available witness invoked his privilege against self-incrimination as to such tax-based testimony. These cases therefore did not answer the issue before us.

### D.      Material Variance

Matthews lastly claims that she was prejudiced by a material variance between Count 1 of the superseding indictment and the proof at trial. Specifically, she argues that Count 1 charged only one dual-object conspiracy to distribute cocaine and methamphetamine, but the proof at trial "exhibited the existence of two separate and distinct" single-object conspiracies— one to distribute cocaine, the other methamphetamine. And she claims that, because the Eastern District of Kentucky was an allegedly improper venue for the cocaine conspiracy, and the jury effectively acquitted her as to the methamphetamine conspiracy, she was prejudiced.

A "variance occurs if the evidence 'proves facts materially different from those alleged in the indictment.'" *United States v. Davis*, 970 F.3d 650, 659 (6th Cir. 2020) (quoting *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007)). "Whether there has been an amendment or variance to an indictment is a legal question that we typically review de novo." *United States v. Beasley*, 583 F.3d 384, 389 (6th Cir. 2009); *United States v. Mize*, 814 F.3d 401, 408 (6th Cir. 2016). But where, as here, the alleged variance rests on a factual question, our review is more deferential; because the number of conspiracies proven at trial "is usually a question of fact to be resolved by the jury[,] . . . [the evidence must] be considered on appeal in the light most favorable to the government." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003). Accordingly, this court asks whether "a rational trier of fact could have found" that the defendant "agreed to participate in a single, overarching conspiracy." *Id.*

The government argues that plain error applies because Matthews did not raise her present variance arguments below. Matthews did not respond to this point, but we need not decide whether the government is right. We need not even decide whether a variance occurred here. That's because Matthews cannot show that any variance, assuming one occurred, prejudiced her.

A variance constitutes reversible error only if the "variance affected the defendant's substantial rights." *United States v. Adams*, 722 F.3d 788, 805 (6th Cir. 2013). This requires the defendant to "prove[] prejudice." *Davis*, 970 F.3d at 659. Prejudice is proven, for example, where the variance deprived the defendant of "notice of the government's factual theory," prevented her from "adequately prepar[ing] h[er] defense," or "could expose h[er] to the risk of 'future prosecutions based upon the same conduct.'" *Id.* (quoting *Beasley*, 583 F.3d at 392). Another type of prejudice is where "'spillover' [occurs] because of a large number of improperly joined defendants," which misleads the jury into transferring criminal intent to less-culpable defendants, thereby prejudicing them. *United States v. Swafford*, 512 F.3d 833, 843 (6th Cir. 2008) (alteration in original) (quotations omitted). Although these theories of prejudice are not necessarily exhaustive, Matthews does not rely on any of them.

The only prejudice that Matthews claims—lack of venue in the Eastern District of Kentucky for the cocaine conspiracy—isn't that prejudicial, and she's wrong about the venue defect anyway. She asserts, without citing a case, that "[t]he prejudice prong of the material variance inquiry requires a venue analysis." Even if we granted her that premise, venue was properly established for the cocaine conspiracy: two cocaine-trafficking trips stopped at the "Bluegrass Airport" in Lexington, Kentucky, which is within Fayette County and the Eastern District of Kentucky, 28 U.S.C. § 97(a), and cocaine was delivered there on one of those two trips. This establishes proper venue for the cocaine conspiracy in the Eastern District. *See Crozier*, 259 F.3d at 519 ("For drug conspiracies, venue is proper in any district where the conspiracy was formed or where an overt act in furtherance of the conspiracy was performed."). Matthews's only claimed prejudice fails.

Moreover, we have repeatedly held that, "if the government proves multiple conspiracies *and a defendant's involvement in at least one of them*, then clearly there is no variance affecting that defendant's substantial rights." *United States v. Robinson*, 547 F.3d 632, 642–43 (6th Cir. 2008) (emphasis added) (quoting *Lee*, 991 F.2d at 349); *see also United States v. English*, 785 F.3d 1052, 1057 (6th Cir. 2015) (same). That dooms any possibility of prejudice here. Matthews's only variance theory is that two conspiracies existed within Count 1—one conspiracy to distribute cocaine and another to distribute methamphetamine. But the jury found

that Matthews participated in the cocaine conspiracy.  Therefore, even if the evidence showed only multiple conspiracies and thus a variance, that could not have prejudiced her as a matter of law—because the jury found that she participated in the cocaine conspiracy anyway.  And here, as in *Robinson*, there is no "danger of 'transferred guilt' from evidence of multiple conspiracies in which [Matthews] was not involved."  *Robinson*, 547 F.3d at 643.  Matthews's three co-defendants at trial were all acquitted of *both* the cocaine *and* methamphetamine conspiracies—so there was no guilt to transfer to her.  Matthews was not prejudiced by any variance, assuming one occurred.

Accordingly, Matthews's challenges to her convictions are meritless.

**III.**

We now turn to Wallace's appeal of his sentence.  As mentioned above, Wallace was one of the pilots who flew flights for Carlson during the conspiracy.  He pleaded guilty to Count 1 in exchange for dismissal of Counts 2 and 3, and he was given a below-Guidelines sentence of 60 months' imprisonment.  We review Wallace's sentence for reasonableness.  *Gall v. United States*, 552 U.S. 38, 51 (2007).  This review "has both procedural and substantive components," *United States v. Young*, 847 F.3d 328, 370 (6th Cir. 2017), and Wallace raises arguments under both.  He fails to show reversible error.

**A.     Procedural Reasonableness**

When reviewing for procedural reasonableness, we ask, among other things, whether the district court properly calculated (and treated as advisory) the Guidelines range, considered the pertinent factors in 18 U.S.C. § 3553(a), did not base its sentence on clearly erroneous facts, and adequately explained the chosen sentence.  *Gall*, 552 U.S. at 51.

We would ordinarily review Wallace's procedural-reasonableness claim for an abuse of discretion, *Young*, 847 F.3d at 370, "keeping in mind that factual findings will stand unless clearly erroneous and legal conclusions will stand unless our fresh review leads to a contrary conclusion," *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).  But because Wallace did not make his procedural arguments below, he must show plain error now, as he concedes.

*See* Wallace Br., at 14–15; *United States v. Vonner*, 516 F.3d 382, 385–86 (6th Cir. 2008) (en banc). This means Wallace must show (1) an error (2) that was obvious or clear, (3) that affected his substantial rights, and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings. *Id.* at 386.

Wallace argues generally throughout his briefing that the district court failed to adequately explain the sentence imposed. He is right that "[t]he district court must provide an 'articulation of the reasons [why it] reached the sentence ultimately imposed.'" *United States v. Solano-Rosales*, 781 F.3d 345, 351 (6th Cir. 2015) (alterations added) (quoting *United States v. Jackson,* 408 F.3d 301, 305 (6th Cir. 2005)). How much explanation? "The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007). Ultimately, this court's "focus is functional in nature." *United States v. Gunter*, 620 F.3d 642, 646 (6th Cir. 2010). That is, it ensures only that the district court "conduct[ed] a meaningful sentencing hearing and truly consider[ed] the defendant's arguments." *Id.*

We find no error in the court's explanation of Wallace's sentence. The court thoroughly considered the applicable statutory sentencing factors, including "the seriousness of [Wallace's] crime"; the need for a sentence that would deter "pilots" from "carrying cocaine, methamphetamine, or marijuana"; Wallace's lack of need for "educational benefits"; and aggravating factors that justified the sentence imposed, namely, Wallace's "greed." *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(2)(D).

And the court did not stop there. It also thoughtfully considered and balanced all applicable mitigating factors, *see id.* § 3553(b)(1), including Wallace's "complete lack of criminal history," his "distinguished military service," that he presents "little or no chance of recidivism," and that he agreed to forfeit his interest in the jet airplane used in the conspiracy. The court explained that it was "balanc[ing] the positive factors against the negative factors," ultimately concluding that a downward variance was warranted. Accordingly, it varied downward from Wallace's 87- to 108-month Guidelines range (a range that Wallace disputed

neither here nor below) and imposed a 60-month sentence. This defeats Wallace's inadequate-explanation argument.

But Wallace persists, identifying three alleged errors that, he says, render his sentence procedurally unreasonable: (1) the court failed to adequately consider and clearly reject one of his mitigation arguments, (2) the court wrongly used "as its starting point and benchmark" a life sentence, and (3) the court wrongly sought to "send a message" to private pilots. No argument persuades.

*First*, Wallace claims that the district court failed to consider (and clearly reject) one of his arguments in his motion for a downward variance—that he was coerced into transporting drugs by the conspiracy's ringleader, Carlson. That argument pointed to his plea agreement's stipulation that, although Wallace flew "as many as ten trips" for Carlson between July 2016 and March 2017, on only "at least one" flight did Wallace know that the cargo included drugs. Wallace argued that he agreed to do that flight only to recover money that Carlson owed him, and that he planned to back out of the flight as soon as Carlson paid him. Once Carlson discovered Wallace's plot, so the argument went, Carlson "informed [Wallace] that his 'Mexican friends' would track [Wallace] and his family down if he didn't make the flight."

Wallace thus claimed he flew that one flight only under duress, which mitigated against a lengthy sentence. Wallace's motion cited no evidence in the record to support any of this, but the government offered a rebuttal—asserting at sentencing that Wallace "succumb[ed] to greed in this matter, [as] the amount of money he received was large."

Wallace claims now that the district court did not adequately consider this mitigation argument at sentencing. However, before announcing Wallace's sentence, the court noted:

> Another thing about the picture that everybody's painted of Robert Carlson, he's a bad guy, he's as bad a guy as I've seen, *but people who get cheated don't usually keep dealing with the cheater* and digging their hole even deeper. *I think the motivation here was greed*, and the willingness to turn a blind eye to Mr. Carlson's illegal activity while betting on [the] game on the end of the day.

The only relevant reason for the court to say this was to respond to Wallace's argument—even if the court failed to use magic words to signal as such. Put differently, this observation

implies that the court considered Wallace's argument (that Carlson extorted him into flying the last flight), but rejected it as a factual matter—finding instead that greed motivated Wallace. And Wallace points to no record evidence (other than assertions made, without record support, in his motion for a downward variance) showing that that factual finding was clearly erroneous. Therefore, even if this was an error, it was not plain error.

*Second,* Wallace seizes on the district court's statement at his sentencing that, "based on the evidence that I heard in this case, [Wallace] would be looking at the rest of [his] life in jail if [he] proceeded to trial." Wallace argues that this "raise[d] a question as to the starting point and benchmark used by the Court when formulating the sentence." But other than flagging this hypothetical question, Wallace offers nothing to show that it ultimately made a difference—*i.e.*, that the court based its sentence on that purported finding. And it's hard to see how the court could have: after all, it varied *downward* from Wallace's 87- to 108-month Guidelines range, imposing a 60-month sentence instead. If the court used as its "starting point and benchmark" a life sentence, it would have made no sense to vary downward from a Guidelines range *already less than* life. Wallace fails to show that this purported error affected his substantial rights—it is thus not plain error.

*Third*, Wallace argues that the district court improperly sought to "send a message" to private pilots (like him) that drug trafficking is illegal. In sending that message, he says, the court wrongly "impute[d] criminal conduct to private pilots in general, and Mr. Wallace in particular, that is not explained in the sentencing record." When viewing the court's statements in their proper context, however, they did not go so far:

> The guidelines in this case are 87 to 108 months. And the *seriousness of this crime creates the need for serious punishment*, one that will send a message particularly into the privileged private pilot world that moving contraband is illegal. It doesn't matter who's moving it, whether they are rich or poor. But moving contraband is illegal and punishable. People who are pilots carry lives in their hands every day. They shouldn't be carrying cocaine, methamphetamine, or marijuana.

The court's statement reflected its view of the seriousness of the offense (a view that Wallace's own counsel conceded moments earlier), not of distain for pilots generally. And, to the extent the court sent a message, it was one of general deterrence—a legally unassailable

purpose for sentencing.  *See* 18 U.S.C. § 3553(a)(2)(B); *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010) ("General deterrence . . . is one of the key purposes of sentencing." (quoting *United States v. Medearis*, 451 F.3d 918, 920–21 (8th Cir. 2006))).  This was not error, let alone plain error.

Ultimately, none of Wallace's procedural arguments establishes plain error.

**B.      Substantive Reasonableness**

As for substantive reasonableness, Wallace argues that the district court assigned excessive weight to his status as a pilot, overstating his role in the conspiracy; he also claims that his 60-month sentence is longer than necessary to accomplish the goals of sentencing.  Neither argument suffices.

A sentence is substantively unreasonable if the "court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual." *Rayyan*, 885 F.3d at 442.  It's "a matter of reasoned discretion, not math." *Id.*  Our review is thus "highly deferential." *Id.* (citing *Gall*, 552 U.S. at 51).  And Wallace faces another hurdle—we presume that his below-Guidelines sentence is substantively reasonable.  *See United States v. Pirosko*, 787 F.3d 358, 374 (6th Cir. 2015).  He has a "demanding burden" to rebut that presumption. *Young*, 847 F.3d at 373.

Wallace has not met his burden.  He first argues that the court's attempt to "send a message" to private pilots caused it to place excessive weight on deterrence.  True, as noted above, the court was apparently motivated by deterrence.  But Wallace offers nothing to show that the court placed *excessive* weight on this factor.  Viewing the transcript as a whole, the court devoted only a few comments at sentencing to deterrence.  It spent just as much time explaining the seriousness of the offense, Wallace's lack of need for educational or vocational training, Wallace's motivations, and factors that mitigated against a hefty sentence.

Wallace next argues that his sentence is too long.  According to him, any sentence longer than the 48-month sentence that he requested is greater than necessary to accomplish the goals of sentencing.  But his offense was serious—although he admitted in his plea agreement to flying

only once knowing that drugs were onboard, that flight alone carried "approximately 80 kilograms of cocaine." That justifies a serious sentence. And even if we reasonably thought his 60-month, below-Guidelines sentence was excessive, that alone "is insufficient to justify reversal." *Gall*, 552 U.S. at 51. Wallace offers no principled argument to persuade us otherwise.

**IV.**

Accordingly, having rejected Matthews's challenges to her convictions and Wallace's challenges to his sentence, we **AFFIRM**.